NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 11

No. 2019-269

| | |
|---|---|
| Jackson Gore Inn, Adams House | Supreme Court |
| | |
| | On Appeal from |
| v. | Property Valuation & Review Division |
| | |
| Town of Ludlow | |
| | December Term, 2019 |

Camilla Roberts, Hearing Officer

Hans G. Huessy of MSK Attorneys, Burlington, for Plaintiff-Appellee.

Stephen S. Ankuda of Parker & Ankuda, P.C., Springfield, for Defendant-Appellant.


PRESENT: Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Wesley, Supr. J. (Ret.), Specially Assigned

¶ 1. **CARROLL, J.** The Town of Ludlow appeals from a decision by a Property Valuation & Review Division (PVR) hearing officer lowering the fair market value of two quarter-time-share condominium properties, Jackson Gore Inn and Adams House, located at the base of Okemo Ski Resort. On appeal, the Town argues that the time-share owners in Jackson Gore Inn and Adams House failed to overcome the presumption of validity of the Town's appraisal. The Town also argues that hearing officer incorrectly interpreted 32 V.S.A. § 3619(b) and failed to properly weigh the evidence and make factual findings. We affirm.

I. Legal Framework

¶ 2. Before moving to the facts of this particular dispute, we briefly discuss the governing law. Unless otherwise provided by law, every April 1, town listers are required to

inventory property located in the town so they can appraise it at fair market value. 32 V.S.A. § 4041, 4044. By June 25, town listers must file a grand list with the town clerk, which contains, among other things, the name of each real property owner and a "brief description of each parcel of taxable real estate." Id. §§ 4151, 4152. Once the list is "lodged" with the clerk, the clerk certifies the list as complete, and the list "become[s] the grand list of such town," except as to any corrections or additions as provided by law. Id. § 4151(c); see Villeneuve v. Town of Underhill, 130 Vt. 446, 452-53, 296 A.2d 192, 196-97 (1972) (explaining that the "grand list was completed, subject to correction or amendment upon appeal, at the time it was lodged in the office of the town clerk").

¶ 3. One of the provided exceptions is for those appealing the listers' appraisal. Any "person aggrieved by the final decision of the listers under [Title 32] . . . may appeal . . . to the board of civil authority" (BCA), 32 V.S.A. § 4404(a), which consists of the "town clerk, selectboard members and justices residing in a town," 24 V.S.A. § 801. The taxpayer or town selectboard may further appeal the BCA's decision to either the Director of the PVR or the superior court of the county in which the property is located. 32 V.S.A. §§ 3007, 4461(a). When an appeal is filed with the Director, a hearing officer is appointed to conduct a de novo hearing to "determine the correct valuation of the property." Id. §§ 4465, 4467.

¶ 4. Determining the correct valuation of the property "is a two-step process." Dewey v. Town of Waitsfield, 2008 VT 41, ¶ 2, 184 Vt. 92, 956 A.2d 508. "First, the fair market value of the property must be determined." Boivin v. Town of Addison, 2010 VT 67, ¶ 7, 188 Vt. 571, 5 A.3d 897 (mem.) (quotation omitted). The "market data approach" and the "income approach" are appropriate "means of determining fair market value." New Eng. Power Co. v. Town of Barnet, 134 Vt. 498, 505, 367 A.2d 1363, 1368 (1976). "In the market approach, the appraiser finds similar properties that have been sold recently, and extrapolates a value for the subject property by comparing it to those recent sales." State Hous. Auth. v. Town of Northfield, 2007

VT 63, ¶ 15, 182 Vt. 90, 933 A.2d 700. The income approach, on the other hand, determines "market value by converting the future benefits of property ownership into an expression of present worth." Beach Props., Inc. v. Town of Ferrisburg, 161 Vt. 368, 372, 640 A.2d 50, 52 (1994) (quotation omitted). Second, the fair market value is "equalized"—by using a common level of appraisal that is expressed as a percentage, Dewey, 2008 VT 41, ¶¶ 2, 6 (quotation omitted)—"to insure that the property is listed comparably to corresponding properties in town," Kachadorian v. Town of Woodstock, 144 Vt. 348, 350, 477 A.2d 965, 967 (1984).

## II. Facts

¶ 5. This tax dispute revolves around a two-phase condominium project located at the base of Okemo Ski Resort in Ludlow, Vermont. The first phase, known as the Jackson Gore Inn, was completed in 2004 and contains 117 condominium units of varying size that are owned in quarter-time-share interests. In other words, four separate time-share interests own a single unit, meaning the 117 units are owned in 468 quarter shares. The first floor of the Jackson Gore Inn is under separate ownership from the time-share interests and consists of "ski area related services," such as a hotel desk area, lounge, and restaurant. The second phase, known as the Adams House, was completed in 2006 and contains 39 condominium units that are also owned in quarter-time-share interests. Each quarter-time-share owner in both condominiums purchases a right to occupy a specific unit over the course of a three-month period that changes every four years.

¶ 6. On April 1, 2018, the Ludlow Board of Listers appraised the Jackson Gore Inn and Adams House properties at $41,770,800 and $11,564,600, respectively.[1] The quarter-time-share-interest owners at both properties grieved the assessed values, arguing that their "properties [were] assessed in excess of their fair market values." In response, the listers conducted "an extensive sales study" to determine the appropriate value for the properties and reduced the Jackson Gore

---

[1] Throughout the litigation, the condominiums have been referred to by both the fair market value and equalized rate. For consistency, we refer to the properties' fair market value unless otherwise noted.

Inn appraisal to $31,779,600. With regard to Adams House, however, the listers explained that they were leaving the property as appraised because only five units had sold in Adams House since April 2017 so there were not enough sales to support a change. The time-share owners appealed the listers' decision for both properties to the Ludlow BCA, and the BCA affirmed.

¶ 7. The time-share owners appealed the BCA's decision on both properties to the Director of the PVR. Pursuant to 32 V.S.A. § 4467, a hearing officer conducted a de novo hearing on May 30, 2019 to determine the correct valuation of the properties. Both the Town and time-share owners presented expert testimony. First, the time-share owners called Michael Bailey, a "Vermont Certified General Appraiser," who testified that using the market approach, he appraised the Jackson Gore Inn and Adams House properties at $25,273,100 and $8,471,200, respectively. Mr. Bailey testified that these values included the "common elements to the project," e.g., the halls and elevators, pool,[2] and storage areas, which "are owned in full by the individual quarter-share owners." But Mr. Bailey did not include the "commercial" elements—such as the restaurant, bars, retails shops, and real estate office located on the first floor of the Jackson Gore Inn—that are listed separately in the grand list and are not part of this appeal."

¶ 8. Mr. Bailey explained that he reached these conclusions by grouping together units of the same size, room count, and view. He then used sales of individual quarter-time-share interests in each group, multiplied by four to represent an entire unit, to calculate a value for each group of units. Finally, Mr. Bailey added each group together to reach a cumulative appraisal for the whole project. In using comparative sales data, Mr. Bailey emphasized that because "[t]he

---

[2] At oral argument, the Town's counsel asserted that the condominium developer owns the pool and health club as a separate commercial unit. Although the pool and health club are described as a "commercial unit," the record indicates they are part of the condominiums' common elements. Schedule C to the condominiums' declaration of ownership rights, which outlines percentage interests in the condominiums' common areas, provides that each unit has an interest in the pool and health club. At the hearing, the Town's appraiser also testified that the pool was a common area.

overall trend in [value of] th[e] project is downward," he "put in a great deal of effort into making sure" he was using a stable sales period. He explained that he identified a stable market period from "January 2017 to the present," where he found forty-five sales of quarter-time-share interests in the Jackson Gore Inn and eight sales in Adams House.[3]

¶ 9.     The Town's appraisal consultant, William Krajeski, owner of New England Municipal Consultants, testified that using a two-step analysis, he valued the Jackson Gore Inn and Adams House properties at $32,179,000 and $11,885,000. First, using a similar market approach to Mr. Bailey, Mr. Krajeski grouped units into categories and then used comparative sales to establish the value for each group of units. Mr. Krajeski concluded, however, that sales after April 1, 2018 should not be considered because they did not "accurately reflect" the value as of April 1 as the market was still declining. Using the market approach, Mr. Krajeski determined that the individual units in Jackson Gore Inn and Adams House properties were worth $31,230,000 and $11,534,000.

¶ 10.     Mr. Krajeski then explained that, using an income approach, he added a value for the common areas because 32 V.S.A. § 3619 directs him to value the individual units as well as the project's common areas.[4] He explained that trying to value the "halls, pools, all the[] different sorts [of] amenities" was "a difficult task" and he could not prove "the cost on a pool or cost of a corridor or whatever." However, Mr. Krajeski testified that the condominium project includes Okemo Limited Liability Company's contract to manage the complex and there is a value to the association owners for the fees they pay into this contract. He elaborated: "[If] Okemo Limited

---

[3]  Mr. Bailey clarified in his testimony that one of these fifty-four sales was actually a listing price that he adjusted based on a ratio he developed to reflect the difference between listing and sale price. The hearing officer was unable to determine which one of the sales was the adjusted listing price "even with careful examination" of the record.

[4]  The relevant part of § 3619 provides that "[t]he town shall set in the grand list as real estate the units and common property of the project of which the time-share estates are a part and shall list the entire property to the association, corporation, or whatever entity is authorized . . . to manage the common property."

Liability were to turn around and say we don't want to manage the project any more . . . . [t]hey are going to sell the contract. . . . There is a value to it much as there would be a lease to a building or anything else." Analyzing homeowners-association fees, Mr. Krajeski determined that Okemo makes $1.3 million annually on the contract, which he then added to the value of the individual units as determined by sales data.

¶ 11. On cross-examination, the time-share owners' counsel questioned Mr. Krajeski on the idea that the statute required him to add value for the common areas when individual units are valued on the basis of comparable sales:

> Q. Can you tell me when someone purchases a time-share unit, are they purchasing also an allotted share in the common elements?
>
> A. Yes.
>
> Q. So why isn't the value of the common elements included in that purchase price[]? Is the value of the common elements included in the purchase price then? You're establishing a separate value for those elements, but when they buy their condominium unit they buy a percentage of the common elements along with their unit.
>
> A. They do. Yes they do. However, the—the statute tells me that there is something beyond that . . . .

Counsel further questioned Mr. Krajeski on his testimony that the management contract was a common area:

> Q. So it's your testimony that th[e] management contract is a real estate value even though—
>
> A. It's a lease—
>
> Q. [T]hird party which doesn't own part of the building?
>
> A. They are the entity that controls the project though. That's what it says.
>
> . . . .
>
> Q. But all it says is that you put the entire value, the value of the units and common area, into the grand list and when someone buys their unit they are buying a percentage of the common area, isn't that correct?

6

A. There is more in value to the project than just the units. There is more in value to it.

Q. So it's your testimony that the duty to pay a management fee to a third party who does not own a property interest in the building is an asset that is taxed to the unit owner?

A. According to th[e] statute, Yes.

¶ 12. On June 27, 2019, the hearing officer issued her decision, in which she concluded that the fair market values of the Jackson Gore Inn and Adams House properties were $25,273,100 and $8,471,200. The hearing officer explained that both appraisers relied on similar data and methodologies to appraise the properties: they both used a market analysis approach that (1) grouped "units by attributes of size, location, bedrooms, bathrooms, and view," (2) followed the "same method of analyzing quarter share sales prices to determine a value per quarter share," and (3) used "a single sale in many of the unit groups, to determine the values for all the units in that group." The officer explained, however, that the appraisers' calculations differed in two main respects: (1) the value added for considering common areas, i.e., the profits of the entity that manages the time-share condominium, and (2) the analysis of the market trend in the value of the projects.

¶ 13. With regard to valuing the common areas, the hearing officer concluded that § 3619 designates an agent—the managing entity of the projects—to handle the tax liability of the individual time-share owners, and it says nothing about whether the "management fees or rental profits are common property." Instead, she explained that unit sales data is sufficient to determine the value of a quarter-share condominium unit because "[t]he sales evidence reflects the expectation of willing sellers and willing buyers regarding all of the contracted interests that go with owning a time-share condominium, including the common interests and management fees spelled out in the contract." She accordingly gave no weight to the Town's analysis of "income

7

approach value attributed to the profit and loss for the entity that handles collection of management fees, and the property taxes."

¶ 14. Finally, the hearing officer considered how each appraiser analyzed the market trend. She summarized that although the Town believed the value of the condominiums was declining—and therefore avoided "all sales that occurred after April 1, 2018"—the time-share owners relied on sales data from "2017 to present" because they believed there was a stable market, The hearing officer, citing Sondergeld v. Town of Hubbardton, 150 Vt. 565, 571, 556 A.2d 64, 68 (1988), concluded that case law sets precedent for considering sales that occurred at least seven months after the target data. Considering this precedent, she found that the Town's appraiser provided no "compelling examples of data evidence to demonstrate that the market trend continue[d] downward." The time-share owners' appraiser, on the other hand, "provided specific data as an example to demonstrate that a stable market occur[ed] from 2017 onward." The hearing officer accordingly concluded that she would consider sales data after April 1, 2018 because the time-share owners' appraiser "demonstrate[d] stronger compliance" with case law.

¶ 15. On appeal, the Town first argues that the time-share owners have not met their burden to produce evidence showing that the town's appraisal is unlawful. The Town insists that § 3619 requires it to consider both the units and the common property separately. The Town alleges, however, that the time-share owners have presented no evidence of the value of the common areas "beyond interval sales as required by 32 V.S.A. § 3619(b)." Second, the Town argues the hearing officer incorrectly interpreted § 3619. Finally, the Town argues that the hearing officer failed to properly weigh the evidence, make factual findings, or adequately explain her conclusions.

¶ 16. We first hold that the hearing officer correctly determined that the time-share owners met their initial burden of producing evidence to overcome the presumption of validity by presenting the testimony of their expert appraiser. Second, we conclude that the hearing officer

8

correctly determined that § 3619 addresses who receives a tax bill when time-share owners are taxed but says nothing about how to value the common elements in condominiums. Finally, we conclude that the hearing officer made clear findings and, in general, provided a well-reasoned and detailed decision.

### III. Jurisdiction

¶ 17. Before addressing the merits, the time-share owners argue that the Court should dismiss the Town's appeal on two separate jurisdictional grounds. First, the time-share owners argue that the present appeal is moot. Second, the Adams House time-share owners argue that the Town did not file a timely notice of appeal regarding the Adams House property. We conclude that the appeal is not moot and that the Town's ambiguous notice of appeal provided sufficient notice to the time-share owners of its intent to appeal the valuation of both properties.

### A. Mootness

¶ 18. "This Court has jurisdiction to decide only actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction." Merriam v. AIG Claims Servs., Inc., 2008 VT 8, ¶ 9, 183 Vt. 568, 945 A.2d 882 (mem.) (quotation omitted). Jurisdiction over an appeal only exists if there is "a live controversy," and the parties "have a legally cognizable interest in the outcome." Id. (quotation omitted). "[A] change in facts or circumstances can render a case moot if this Court can no longer grant effective relief." Houston v. Town of Waitsfield, 2007 VT 135, ¶ 5, 183 Vt. 543, 944 A.2d 260 (mem.) (quotation omitted).

¶ 19. On July 3, 2019, the time-share owners received a letter from the Ludlow Town Clerk[5] with a copy of their tax bill for the fiscal year ending June 30, 2019. The letter explained that the Jackson Gore Inn and Adams House owners were issued tax credits on any overpaid taxes that would be carried forward to the next fiscal year. The time-share owners argue that the present appeal is now moot because this letter demonstrates that the Town Clerk entered the appraisal

---

[5] In Ludlow, one person serves as both the clerk and treasurer.

values determined by the hearing officer into the 2018 and 2019 grand lists; therefore, they argue that the grand list is final and not subject to any further legal challenge. Furthermore, citing 32 V.S.A. § 4469, the time-share owners argue that "even if the Town were to prevail on appeal, there is no mechanism under Title 32 for the Town to retroactively collect any underpaid property taxes." The Town responds, with no corresponding evidence, that they are not bound by the Clerk's actions because they were not authorized by the Selectboard.

¶ 20.    As an initial matter, the time-share owners have presented no definitive evidence that the Town Clerk actually assessed taxes based on the values determined by the hearing officer. They have provided the Court only with a letter from the Clerk that references tax bills for the "fiscal year ending June 30, 2019." They have not provided the actual tax bills. The only evidence they have presented is that the Town Clerk issued $154,157.82 in tax credits to Jackson Gore Inn and $8,884.22 in credits to the Adams House. The tax credits alone do not indicate the appraised values the Clerk used to assess taxes, and the Adams House time-share owners have presented no other evidence.[6]

¶ 21.    Nevertheless, assuming, without deciding, that the Clerk assessed taxes based on the hearing officer's decision, the various provision of Title 32 indicate that the Clerk's actions did not finalize the grand list. When the town listers file a grand list with the town clerk every June 25, and the town clerk certifies the list, it "become[s] the grand list of such town," except as to any corrections or additions otherwise provided by law. 32 V.S.A. § 4151; Villeneuve,130 Vt. at 453, 296 A.2d at 197. One of the provided exceptions is for corrections to the grand list that

---

[6] In Villeneuve v. Town of Underhill, we held that towns could assess taxes against taxpayers while they are appealing the listers' appraisals. 130 Vt. at 454, 296 A.2d at 196-97. If taxpayers are ultimately successful on appeal, they are entitled to a tax credit on any overpaid taxes. 32 V.S.A. § 4469. Here, if the Town Clerk had assessed taxes based on the hearing officer's decision, the time-share owners should have received tax credits that reflected the difference between the listers' initial appraisal and the lower values entered by the hearing officer. This difference, based on the equalized rate, is approximately $6,311,312 for Jackson Gore and $3,000,562 for Adams House. The tax credits the Clerk issued for different mathematical amounts therefore do not alone confirm that the Clerk assessed taxes based on the hearing officer's decision.

result from taxpayers appealing the lister's appraised value. 32 V.S.A. § 4404. When this appeals process "has been finally determined," the selectboard and town listers "endorse a certificate to that effect upon the grand list," and the town clerk attests to the same with the date of such attestation. Id. §§ 4155, 4156. Once the selectboard and listers certify the grand list, it becomes "the legal grand list of the Town, and 'its validity shall not be put in issue by any party to any action in any hearing or trial in any court.' " Rooney Vt. Assocs. v. Town of Pownal, 140 Vt. 150, 155, 436 A.2d 733, 735 (1981) (quoting 32 V.S.A. § 4157); see also Lewis v. Town of Brandon, 132 Vt. 37, 41, 313 A.2d 673, 675 (1973) (holding that "[g]rand lists are not subject to collateral attack"). A grand list is only final, and not subject to further legal challenge, when the selectboard and listers certify that the appeals process has been completed.

¶ 22. Furthermore, 32 V.S.A. § 4469 is not applicable until the appeals process has been completed. Section 4469, entitled "[t]ax credit upon successful appeal," provides that "[w]henever a taxpayer has had his or her appraisal reduced upon appeal and has paid the tax due upon the original appraisal which he or she appealed, the taxpayer shall be entitled to a credit against the tax for the next ensuing tax year." 32 V.S.A. § 4469 (emphasis added). The clear import of § 4469, especially when considering the other provisions of Title 32, is that taxpayers are entitled to a tax credit once they have successfully appealed.

¶ 23. In sum, regardless of whether the Town Clerk had authority to assess taxes against the time-share owners, the Clerk's actions do not alone finalize the grand list, and the time-share owners are not entitled to the protection of § 4469 because the appeals process has not been completed.

B. Notice of Appeal

¶ 24. The Adams House time-share owners also argue that the Court does not have jurisdiction because the Town did not timely file a notice of appeal regarding the Adams House property. The Adams House time-share owners point out that the Town's notice of appeal and

11

docketing statement "reference only one Docket Number"—the one relating to the Jackson Gore Inn—and the Town only submitted a single filing fee. The Town argues, on the other hand, that its notice of appeal complied with the Vermont Rules of Appellate Procedure.

¶ 25. The Vermont Rules of Appellate Procedure provide that to file an appeal, a party, "within 30 days after entry of the judgment or order appealed from," V.R.A.P. 4(a)(1), must pay a filing fee and file a notice of appeal that (1) names each party "in the caption or body of the notice," (2) designates the judgment being appealed, and (3) "name[s] the court to which the appeal is taken," V.R.A.P. 3(b)(1), (d)(1). Although "the timely filing of the notice of appeal is a jurisdictional requirement," In re Guardianship of L.B., 147 Vt. 82, 84, 510 A.2d 1319, 1321 (1986), "[a]n appellant's failure to take [any other step] . . . does not affect the appeal's validity," V.R.A.P. 3(b)(1)(D). Rule 3 expressly provides that "[a]n appeal will not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." V.R.A.P. 3(d)(5).

¶ 26. An appellant's failure to comply with the Rules of Appellate Procedure, however, gives this Court discretion to "take any appropriate action, including dismissal." V.R.A.P. 3(b)(1)(D). In exercising this discretion, we have consistently considered whether a party's failure to comply with the appellate rules was prejudicial. See In re Shantee Point, Inc., 174 Vt. 248, 259, 811 A.2d 1243, 1253 (2002) ("An error in compliance with V.R.A.P. will affect the validity of an appeal only if it is prejudicial to another party."). We have accordingly focused on whether a notice of appeal "specifically indicates an intent to appeal and gives sufficient notice of that intent." Id.; see also Blake v. Nationwide Ins., 2006 VT 48, ¶ 11 n.3, 180 Vt. 14, 904 A.2d 1071 (concluding that party was "not prejudiced by allowing plaintiff to appeal from the final judgment . . . since it was given sufficient notice of the issues on appeal and had the opportunity to fully brief them"); Perry v. Green Mountain Mall, 2004 VT 69, ¶ 6 n.2, 177 Vt. 109, 857 A.2d 793 (explaining that "[n]otices of appeal are interpreted 'liberally' and in the context of the case"). "If

a litigant's action is the functional equivalent of what the rule requires, we will find compliance." Shantee Point, Inc., 174 Vt. at 259, 811 A.2d at 1252.

¶ 27. As a threshold matter, at oral argument, counsel for the Adams House time-share owners argued that Rule 3 does not apply under these circumstances because "Rule 3(d) contemplates a single matter being appealed—it isn't written in the context of two separate matters being appealed." In Shantee Point, Inc., 174 Vt. at 259, 811 A.2d at 1246, we held otherwise. In that case, two separate cases regarding a road relocation were heard "in conjunction" in the environmental and superior courts. Id. at 251, 811 A.2d at 1247. The environmental judge presided over both the environmental and superior court cases without formally consolidating them. A party to the proceedings filed an "ambiguous" single notice of appeal that referenced the proceedings in both cases. Id. at 260, 811 A.2d at 1253. The notice referenced the decisions and order of the environmental court. Id. Despite only filing a single notice of appeal for two separate appeals, this Court engaged in a prejudice analysis under Rule 3.

¶ 28. Shantee Point, Inc. dictates that Rule 3's prejudice analysis applies here. Similar to Shantee Point, Inc., the PVR hearing officer heard two separate appeals together without consolidating them. The Town's counsel then similarly filed a single notice of appeal attempting to appeal both decisions that included both parties' names and provided it was appealing the hearing officer's decision. The crucial inquiry is, therefore, whether the Adams House time-share owners were prejudiced by the Town's notice of appeal.

¶ 29. We conclude that the Town's notice of appeal, especially when considered in light of the underlying facts of this case, indicates a clear intent to appeal both cases—Jackson Gore Inn v. Town of Ludlow, Docket No. PVR 2018-33, and Adams House v. Town of Ludlow, Docket No. PVR 2018-34—and gave the Adams House time-share owners sufficient notice. On September 28, 2018, Jackson Gore Inn and Adams House filed separate notices of appeal from the Ludlow BCA. In a letter dated February 11, 2019, the hearing officer appointed to conduct the

13

hearing explained that a single hearing had been scheduled for both appeals because they "relate to a dispute arising from the valuation of the property." At the hearing, the hearing officer again reiterated that the appeals "PVR 2018-33 and 34 [were] bundled together" for the present hearing. On June 27, 2019, the Docket Clerk for the Vermont Department of Taxes sent counsel representing the Jackson Gore and Adams House time-share owners a letter with the hearing officer's decision. The letter had the following subject line: "Jackson Gore Inn Condominium Association v. Town of Ludlow Docket Number PVR 2018-33." The hearing officer's decision attached to the letter, however, explained that "[t]he properties under appeal [were] bundled together for the hearing of the appeals."

¶ 30. On July 23, the Town filed a notice of appeal indicating that it was appealing the hearing officer's decision, which included the caption "Jackson Gore Inn and Adams House v. Town of Ludlow" and the Docket Number PVR 2018-33. On August 1, the Town filed its docketing statement and transcript order form with the court clerk. The docketing statement included both parties' names, and the transcript order form included both parties' names and the docket numbers for both cases.

¶ 31. Although the Town's notice of appeal was less than ideal—and the better practice certainly would have been to file two separate notices—the single notice of appeal was nevertheless sufficient to indicate an intent to appeal and to give notice to the Adams House time-share owners. As early as February 2019, counsel for the time-share owners was on notice that the hearing officer was considering the appeals together because they were based on the same underlying facts. On June 27, when counsel received a copy of the hearing officer's decision, he knew that the hearing officer issued a single decision for both appeals. Given this procedural history, the Town's notice of appeal certainly indicated a clear intent to appeal both cases and gave the time-share owners notice: It included the names of both parties and expressly provided that the Town was appealing the Hearing Officer's decision, which counsel certainly knew included both

properties. In addition, the Town's docketing statement and transcript order form included both parties' names and the docket numbers for both cases.[7] Finally, we note that although the Town initially only paid a single filing fee, it has since, upon direction by the Court, paid a second filing fee.

## IV. Merits

¶ 32. Moving to the merits, the Town argues that (1) the time-share owners did not meet their burden to overcome the presumption of validity that attaches to the Town's appraisal, (2) the hearing officer committed legal error in not giving any weight to the profits of the entity that manages the time-share condominium, and (3) the hearing officer failed to properly weigh the evidence, make factual findings, or explain her conclusions.

¶ 33. We review the hearing officer's legal conclusions de novo. Williams v. Town of N. Hero, 2018 VT 114, ¶ 10, ___ Vt. ___, 200 A.3d 1082. Findings of fact, however, are reviewed for clear error. Id. We will affirm the hearing officer's decision if the "findings [are] rationally drawn from the evidence and are based on a correct interpretation of the law." Barrett v. Town of Warren, 2005 VT 107, ¶ 5, 179 Vt. 134, 892 A.2d 152.

## A. Presumption of Validity

¶ 34. The Town argues that the time-share owners did not meet their burden because the Town's appraisal was based on both the value of the individual units—as established through comparative-sales data—and the value of the common areas as required by 32 V.S.A. § 3619(b). The time-share owners could not have met their burden to prove the Town's appraisal was unlawful, the Town argues, because the time-share owners presented no evidence beyond interval sales.

---

[7] It is important to our decision that the Town's notice of appeal included both case names. We do not mean to suggest that a docketing statement or transcript order form may substitute for a faulty notice of appeal. We point to the docketing statement and transcript order form only as evidence of notice supporting a finding of lack of prejudice.

¶ 35. In a taxpayer appeal under § 4467, when a town produces evidence of fair market value, there is a basic presumption that a town's appraisal is "valid and legal." Kruse v. Town of Westford, 145 Vt. 368, 371, 488 A.2d 770, 772 (1985). "This is a bursting bubble presumption . . . ." Vanderminden, A Family Ltd. P'ship v. Town of Wells, 2013 VT 49, ¶ 8, 194 Vt. 96, 75 A.3d 598. This "locative" presumption places the initial burden of coming "forward with evidence" on taxpayers challenging a Town's appraisal, but they "are without any independent probative value." Rutland County Club, Inc. v. City of Rutland, 140 Vt. 142, 145, 436 A.2d 730, 731 (1981). Taxpayers therefore have the initial procedural burden of overcoming this presumption by producing "evidence fairly and reasonably tending to show that [their] property was [appraised] at more than fair market value." Jeffer v. Town of Chester, 138 Vt. 478, 480, 417 A.2d 937, 938 (1980). The hearing officer must determine only whether the taxpayer has produced admissible evidence that affords "a basis for a rational inference of the fact to be proved." City of Barre v. Town of Orange, 152 Vt. 442, 444, 566 A.2d 951, 952 (1989) (quotation omitted). Because the applicable standard concerns the admissibility, rather than credibility, of the facts used to overcome the presumption, "[t]he evidence required to burst the bubble is . . . modest." In re Bilmar Team Cleaners, 2015 VT 10, ¶ 11, 198 Vt. 330, 114 A.3d 483.

¶ 36. Here, the time-share owners presented the testimony of their expert appraiser who detailed how he relied on sales data, including sales after April 1, 2018, to determine that the time-share condominium properties had a significantly lower fair market value than the Town alleged. In addition, contrary to the Town's assertion, the appraiser presented evidence about the value of the condominiums' common areas. The appraiser explained that the "common elements to the project are owned in full by the individual quarter-share owners." Under the appraiser's analysis, the sales data of the individual units included the value of the common areas. By producing the expert appraiser's testimony that the properties were overvalued, the time-share owners overcame the presumption of validity. See Jeffer, 138 Vt. at 480, 417 A.2d at 938 (holding that taxpayer met

burden by introducing "appraiser's testimony as to the fair market value"); Welch v. Town of Ludlow, 136 Vt. 83, 86-87, 385 A.2d 1105, 1107-08 (1978) (holding that taxpayer met burden by presenting "two witnesses who testified as to the fair market value of the subject property"); Rutland County Club, Inc., 140 Vt. at 144-46, 436 A.2d at 731-32 (holding that taxpayer met burden by presenting independent appraiser's testimony on fair market value).

B. Statutory Criteria

¶ 37.    "Once the presumption disappears, the town is required to show either that it substantially complied with the relevant statutory and constitutional requirements or that its valuation was supported by independent evidence of fair market value." Vanderminden, 2013 VT 49, ¶ 8 (quotation omitted).  The Town argues that its appraisal complied with the relevant statutory criteria because § 3619 requires it to value "both the units and common property of the project of which the time-share estates are a part."  The Town emphasizes that, in its view, § 3619 calls for a distinct valuation methodology for time shares as contrasted with condominiums.  It claims that the hearing officer's "rejection of evidence" concerning the profits of the entity that manages the time-share condominium "is not in accord with the Vermont [s]tatutory framework."[8]  The time-share owners, however, submit that the hearing officer correctly interpreted § 3619, arguing that it simply provides that "the tax bill be issued to a single entity and entered on the Grand List under one name" and does not dictate an alternative analysis of fair market value.  They argue that towns cannot separately tax a condominium project's common elements.

¶ 38.    The Town's interpretation of § 3619 is incorrect.  Title 32 requires town listers first to appraise taxable real property and then, once the property is appraised, to file a grand list with the town clerk that, as a general rule, identifies the property by the owner.  32 V.S.A. §§ 4041,

---

[8]  The Town is arguing that § 3619 requires it to add the net profits of the entity that manages the time-share condominium to the individual unit sales. The Town has further explained that, in this case, the profits of the managing entity include: the profits on the contract to manage the facility, the profits from the operation of the time share inn, and fees the time-share owners pay to use the pool and health club.

17

4044, 4152. In the case of time-shares projects, however, there is not a single owner of the property. For example, the two properties in this dispute are owned by 624 separate quarter-time-share-interest owners. Recognizing the administrative burden it would place on towns to list each individual owner in the grand list, the Legislature created an exception to the general rule that individual owners be billed.

¶ 39. Section 3619 provides that for time-share projects, the town shall list the "units and common property" that make up the time-share project to the entity "authorized by the project instruments to manage the common property." Id. § 3619(b). The statute appoints the entity that manages the common property as the "agent of the time-share-estate owners for the payment of property taxes from the individual owners to the town." Section 3619 provides a streamlined process for towns to collect taxes from time-share-estate owners by allowing towns to list a single entity in the grand list, rather than going through the burdensome process of listing each individual time-share-estate owner. The Florida Supreme Court, in interpreting a similar statute, explained that it "provide[d] a reasonable method to assess and collect taxes from property held under the new ownership concept of 'fee time-share estates.' " Day v. High Point Condo. Resorts Ltd., 521 So. 2d 1064, 1065 (Fla. 1988). Section 3619 simply provides an exception in the case of time-share projects concerning to whom property is listed in the grand list; it says nothing about how real property is appraised.

¶ 40. How the underlying real property in a time-share project is appraised is still based on estimated fair market value, which is defined as "the price that the property will bring in the market when offered for sale and purchased by another, taking into consideration all the elements . . . that combine to give property a market value." 32 V.S.A. § 3481. Although only real property is taxable, "[a]ll of the elements, tangible and intangible, that combine to give real property fair market value are subject to property tax." Barrett, 2005 VT 107, ¶ 11. "[S]ales of comparable properties between a willing buyer and seller at arms length are a valid basis for estimating fair

18

market value." TransCanada Hydro Ne., Inc. v. Town of Rockingham, 2016 VT 100, ¶ 54, 203 Vt. 289, 154 A.3d 486 (quotation omitted). In fact, "[w]e have characterized the use of such sales as the most persuasive method of appraising residential property in Vermont." Barrett, 2005 VT 107, ¶ 6 (quotation omitted). Section 3619 does not require any other method for valuing real property owned in time-share estates.

¶ 41. Here, the underlying taxable real property is a series of quarter-time-share-estate interests in condominium units. By statute, a condominium "unit . . . together with its interest in the common elements, constitutes for all purposes a separate parcel of real estate." 27A V.S.A. § 1-105(a)(1). Because the real property consists of both the unit and the common elements, "no separate tax or assessment may be rendered against any common elements." Id. § 1-105(a)(2). Rather, as we explained in Barrett v. Town of Warren, the fair market value of a condominium includes the individual units, the common elements, and the membership in the association. 2005 VT 107, ¶¶ 11-13. We further explained in Barrett that although a membership in a condominium association, which included the obligation to pay association fees, was an "intangible" asset, the membership was an "intrinsic feature of the condominium unit" that influenced fair market value. Id. ¶ 13.

¶ 42. Considering these principles of taxation, the hearing officer correctly determined as a matter of law that the profits of the entity that manages the time-share condominium could not be added to the value of the sale price of the individual time-share units. In her decision, the hearing officer first correctly explained that § 3619 "is very specific that the time share unit owners' tax liability shall be handled through the managing entity" and "does not specify that the management fees or rental profits are common property for the individual time share owners." Second, she explained that the unit sales data is alone "sufficient to determine the worth of a quarter share condominium unit, as the sellers and buyers are considering all rights and amenities and contracted obligations in the unit and the common areas that go with that ownership," which

19

includes the "common interests and management fees spelled out in the contract." The hearing officer correctly applied the relevant legal principles to conclude that unit sales alone reflected fair market value and § 3619 did not dictate otherwise.

## C. Weight of the Evidence

¶ 43. The Town's last argument is that the hearing officer failed to properly weigh the evidence and make findings to support her ultimate conclusions. The Town specifically argues that the hearing officer improperly adopted the findings of the time-share owners' appraiser without independently explaining her conclusions that the market was sufficiently stable to allow consideration of sales that occurred after April 1, 2018. Finally, the Town suggests there was an "absence of a reasonable number of comparative sales of the various group types within the two subject properties." The time-share owners argue, on the other hand, the hearing officer provided a well-reasoned and detailed explanation that was supported by her findings.

¶ 44. Title 32 directs the hearing officer to conduct a de novo hearing and make findings of fact to determine the correct valuation of the property. 32 V.S.A. § 4467. The hearing officer is required to "sift the evidence and make findings sufficient to indicate to the parties how it reached its ultimate conclusion." Kruse, 145 Vt. at 374, 488 A.2d at 774. It is accordingly "within the province of the [hearing officer] to determine fairly, justly and equitably the fair market value of the subject property according to the evidence presented." Kachadorian v. Town of Woodstock, 149 Vt. 446, 448, 545 A.2d 509, 511 (1988). Although the hearing officer is required to consider all the evidence, whether it be expert or lay, in determining fair market value, the weight to be accorded such evidence lies with the hearing officer. New Eng. Power Co., 134 Vt. at 504, 356 A.2d at 1367; Connors v. Town of Dorset, 134 Vt. 233, 235, 356 A.2d 536, 537 (1976). If the hearing officer's decision "is supported by some evidence from the record, the appellant bears the burden of demonstrating that the exercise of discretion was clearly erroneous." Hoiska v. Town of E. Montpelier, 2014 VT 80, ¶ 9, 197 Vt. 196, 101 A.3d 890 (quotation omitted).

20

¶ 45. Although the Town claims that the hearing officer only conclusorily discussed each appraiser's testimony and inappropriately "pick[ed] sides" by adopting the analysis of one party, we conclude that hearing officer's decision exceeds the requirements outlined above. She clearly explained each appraiser's calculations, where they agreed and disagreed, and why she was crediting one appraiser over the other. See TransCanada Hydro Ne., Inc., 2016 VT 100, ¶ 38 ("If the trial court considered the various approaches offered, assigned weight to each approach, and provided a thorough explanation for its findings and conclusions we will not overturn the court if its order appears to be fair, just and equitable according to the evidence presented." (quotation omitted)).

¶ 46. The hearing officer explained that "[b]oth parties submitted a market analysis appraisal for each property as evidence of fair market value" that (1) limited the sales data to these two projects, (2) grouped units by "attributes of size, location, bedroom, bathrooms, and view," and (3) used a "single sale in many of the unit groups, to determine the values for all the units in the group." Despite these similarities, each appraiser had a different conclusion on fair market value: The Town's appraiser valued the Jackson Gore Inn and Adams House respectively at $32,179,000 and $11,885,000 while the time-share owners' appraiser valued the properties at $25,273,100 and $8,471,200.

¶ 47. The hearing officer concluded that these differences were primarily the result of two things: The Town's appraiser added the value of the profits of the entity that manages the time-share condominium to unit sales data and did not consider sales data after April 1, 2018. The hearing officer then made factual findings and explained her conclusions on each of these disputed calculations. First, the hearing officer correctly determined that the profits from the management contract could not be added to the unit sales data. She accordingly concluded that she was giving "no weight" to the value the Town added for the profits of the entity that manages the time-share condominium.

21

¶ 48. Second, the hearing officer correctly determined that sales occurring after the appraisal date may be relevant in determining fair market value. Sondergeld, 150 Vt. at 571-72, 556 A.2d at 68. In this case, the hearing officer concluded that sales data after April 1, 2018 was probative because she concluded the market for timeshares was stable from 2017 to the time of the hearing. Her finding on the point was supported by testimony from the time-share owners' appraiser. In particular, she noted the time-share owners' data demonstrating the stability of the market, citing to the time-share owners appraiser's report to provide a concrete example: "[Q]uarter shares in units with 775 square feet sold on 06/28/2017 for $32,500, on 5/01/18 for $31,500, and on 11/20/2018 for $32,500." In contrast, she found that the Town's appraiser provided no compelling evidence "to demonstrate that the market trend continues downward." The hearing officer's conclusion that the market was stable, and thus her consideration of post April 1 market sales, was supported by the evidence and not clearly erroneous.

¶ 49. The hearing officer was presented with two appraisers' reports, determined the two principal reasons why they differed on their conclusions of fair market value, and explained why she found the time-share owners' expert more credible with specific cites to the record to support these conclusions. The record demonstrates that the hearing officer "sift[ed]" the evidence and made "findings sufficient to indicate to the parties how [she] reached [her] ultimate conclusion." Kruse, 145 Vt. at 374, 488 A.2d at 774.

¶ 50. The Town's remaining arguments as to other errors by the hearing officer are unpersuasive. The Town asserts that the hearing officer erred because there was an "absence of a reasonable number of comparative sales of the various group types within the two subject properties." "[A]n actual sale is strong evidence of fair market value." Barrett/Canfield, LLC v. City of Rutland, 171 Vt. 196, 199, 762 A.2d 823, 825 (2000); see also Sondergeld, 150 Vt. at 567, 566 A.2d at 66 ("[T]he most persuasive method of appraising residential property in Vermont is to establish fair market value through bona fide sales transactions."). We have noted, however,

that "there may be situations where a court must look beyond a sale," such as "where some evidence undermines the bona fide nature of the sale." Barrett/Canfield, LLC, 171 Vt. at 199, 762 A.2d at 825.

¶ 51.    Here, the Town has presented no evidence that the sales the hearing officer relied upon were not reliable indicators of fair market value.  In fact, as the Town conceded at oral argument, both the Town and time-share owners generally relied on the same comparative sales data.  The hearing officer expressly found that both appraisers used a "single sale in many of the unit groups, to determine the values for all the units in that group."  The Town cannot credibly claim that the hearing officer erred by relying on sales data when their appraisal generally relied on the same sales data.

¶ 52.    Lastly, the Town argues that the hearing officer failed to explain why she did not adjust sale prices "based upon marketing times."  The record indicates otherwise.  Time adjustment is the practice of adjusting sales information to account for changes in price levels over time. TransCanada Hydro Ne., Inc., 2016 VT 100, ¶¶ 41-42.  The hearing officer determined that no time adjustment was necessary because the time-share's appraiser "provided specific data as an example to demonstrate that a stable market occurr[ed] from 2017 onward."

Affirmed.

FOR THE COURT:

_____
Associate Justice