Filed 02/06/26

| | |
|---|---|
| VERMONT SUPERIOR COURT<br>Chittenden Unit<br>175 Main Street<br>Burlington VT 05402<br>802-863-3467<br>www.vermontjudiciary.org | CIVIL DIVISION<br>Case Nos. 23-CV-4443<br>22-CV-3462 |



| | |
|---|---|
| GREGG BELDOCK AND ELIZABETH BELDOCK,<br>     Appellants<br><br>v.<br><br>TOWN OF CHARLOTTE,<br>     Defendant<br><br>In re: BELDOCK | DECISION AND ORDER |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

In these consolidated property tax appeals, Appellants Gregg and Elizabeth Beldock (the "Beldocks") challenge the assessed value of their property located at 900 Plouffe Lane in Charlotte. The Beldocks believe that the Town of Charlotte's (the "Town") assessed value of their property in the 2022 and 2023 tax years does not represent the appropriate fair market value due to pervasive gunshot noise experienced at their property from a nearby shooting range. The Town contends that the Beldocks have failed to carry their burden to overcome the presumption of legality, and further that the record lacks sufficient evidence of any negative impact of the noise on the fair market value of the property. The Court held a two-day bench trial on the merits. Plaintiffs appeared in person and were represented by Attorney Erin Miller Heins, Esq. Defendant appeared in person and was represented by Attorney John Klesch, Esq. The Court heard testimony from the parties, other fact witnesses, and the parties' expert witnesses, and admitted numerous exhibits by stipulation of the parties. The Court allowed the parties time to submit post-hearing memoranda and then took the matter under advisement for determination. In consideration of the credible evidence presented, testimony provided, and admitted exhibits, the Court now issues the following Findings of Fact, Conclusions of Law, and Order.

### Findings of Fact

Based on the credible evidence presented, the Court finds the following relevant facts established by a preponderance of the evidence.

Appellants Gregg and Elizabeth Beldock are the owners of property located at 900 Plouffe Lane in Charlotte, Vermont. The Beldocks bought the property in 1995 and have lived

there since that time.  It consists of 178 acres, 10 of which are designated as the homestead area.[1]  The setting of the property is bucolic, with pastures, open fields, and woodlands.  The Beldocks describe it as very beautiful and private.  The surrounding land cannot be developed.  It affords abundant opportunities for outdoor recreation, with almost 18 kilometers of trails for activities like cross-country skiing, hiking, riding, and running.  The property also contains a working farm, with barns and sheds where the Beldocks at various times kept horses, donkeys, sheep, and chickens.  Additionally, the Beldocks planted and tended large vegetable gardens.  There are significant maintenance costs for the property, estimated to be over $100,000 per year, which includes clearing the trails and maintaining fences, fields, and roads.

The Beldocks' home sits at the highest elevation point on the property.  It is a two-story dwelling, with 63 windows, including a considerable amount of glass on the east side.  There are outdoor patios with views of the fields and the Adirondack Mountains.  Over the years, the Beldocks and their family have enjoyed eating and entertaining friends outside and taking full advantage of all the outdoor spaces and activities of country living.

The Laberge Shooting Range is located on Lime Kiln Road in Charlotte, less than one mile from the Beldocks' property.  *See generally* Ex. T.  According to Mr. Beldock, the range is about 4000 feet away, "as the crow flies."  The shooting range has been in operation since the Beldocks bought their property.  Mr. Beldock has visited the range and shot weapons there.  However, beginning in 2019 and 2020, the gunshot noise from the shooting range has become significantly worse, in terms of the level of sound, the frequency of use, and the types of guns used.  The Beldocks credibly testified that the change in frequency, intensity, and character of the gunshots renders their outdoor space virtually unusable, and has greatly impacted their quality of life in their home and on the property.  Ms. Beldock compared the situation to "living in a military zone."  The range does not follow any set schedule, and so the disruption of the noise is unpredictable.  However, the activity is heaviest on the weekends.  The Beldocks cannot use their outdoor living and dining space or enjoy working in their gardens or using their trails.  The agricultural uses of the land have suffered.  The gunshots have startled the Beldocks' animals, particularly the horses; Mr. Beldock and his son have been thrown off their horses as a result of the gunshot noise, and their farrier was knocked back by a startled horse.  Trees on the Beldocks' property have been hit by bullets from the range, causing the Beldocks to fear for their safety on the trails.  Gunshot sound can be heard and vibrations are felt inside the Beldocks' home.  This interferes with Mr. Beldock's ability to use his home office, and on one occasion a sculpture in the home fell over due to the vibrations.  The Beldocks cannot keep their windows open during the summer.  The range is used throughout the year in all four seasons.  The noise is annoying, disturbing and intimidating, and the exposure has impacted the Beldocks' physical and mental health.

Prior to 2022, the Beldocks had not challenged the assessment of the fair market value of their property for tax purposes.  In 2022, the Town of Charlotte appraised the Beldocks' property at $1,451,700.  Ex. A.  This is the same value that was in place since the prior re-appraisal in 2016.  In 2023, the Town performed a town-wide reappraisal, and valued the Beldocks' property

---

[1] In 2023, the Beldocks added approximately 29 acres to their property as part of a settlement of a civil lawsuit, bringing the acreage from 149 to 178.

at $2,069,800.  Ex. B.  Neither of these appraisals considered the impact of the gunshot noise from the Laberge Shooting Range on the property.  Lisa Truchon worked with the local town assessor to conduct the 2023 property reappraisal for the Town, and testified at the hearing as the Town's expert witness with respect to assessment and fair market value.  Ms. Truchon has been employed by the New England Municipal Resource Center ("NEMRC") since 2012 and has considerable experience conducting property tax assessments and valuations for various Vermont municipalities.  She testified that the appraisals of the fair market value of the Beldocks' property in both 2022 and 2023 were established according to the proper methodology.  The Town uses a "cost approach" to determine fair market value and generates cost sheets, such as Exhibits A and B.  Ms. Truchon explained that a land schedule was created for the appraisal based on sales data for Charlotte during the prior three-year period.  This schedule analyzes developments in different locations and for types of properties (such as on the lakefront or along Route 7, and residential vs. commercial), and then generates a standard land value.  Subject properties are given different "grade" adjustments, depending on their comparison to the average.  A grade number 1 indicates equal to average, and grade 2 indicates twice as good as the average.  The Town does not use the neighborhood multiplier number in its appraisals.  Any positive or negative influences are captured in the grade assignment.  There is also a town-wide schedule or table created for physical depreciation, which assigns various percentages based on the age and expected condition of a residence.  The Beldocks' property was subject to 12% and 13% reductions for physical depreciation in 2022 and 2023, respectively.  No adjustment was made for functional or economic depreciation in either year.

The Beldocks grieved their 2022 assessment to the Town of Charlotte Board of Civil Authority ("BCA").  Ms. Truchon participated in that proceeding and appeared for the Town Assessor's Office before the BCA.  The Beldocks argued that the fair market value of the property should be reduced due to the adverse impact of the noise from the Laberge Shooting Range.  However, the BCA denied any value change because it was presented with "no evidence to demonstrate or support a negative market reduction in property value" due to "the influences of firearm discharge on neighboring properties."  Ex. D.  Ms. Truchon indicated that for that year, she was unable to pull enough sales information to determine "much of anything" regarding the impact of the location area of the property.  The Beldocks similarly grieved their 2023 assessment to the Charlotte BCA on the same grounds, and Ms. Truchon also participated in that process.  The BCA noted that the Beldocks "did not present any specific sales information to show the effect of the shooting range on market value," but agreed to perform a site visit.  Ex. S.  Following the September 2023 site visit, the BCA Property Inspection Committee produced a Property Inspection Report to the BCA.  Ex. 21.  The report stated that "noise of the firing range could be heard" at the property.  Further, the committee members agreed that "the proximity, topography and location of the firing range could have some negative effect on the sales value of the property."  *Id*.  However, the report reiterated that "there has been no evidence presented by the homeowners of the effect on actual sales that have occurred proximate to the Laberge firing range."  Accordingly, the Beldocks' 2023 grievance was denied.

In 2021, the Beldocks retained Isaac Old of RSG Consulting, an experienced acoustics and noise control engineer, to measure the sounds levels on their property of the gunshots from the Laberge Shooting Range.  Mr. Old returned to the property in 2024 to update his measurements and confirm that the conditions were similar at that time, which includes the years

of the property tax appeals. Mr. Old was qualified as an expert and testified at trial. During both studies, Old collected multiple days of data, and then analyzed and reported on the data for one weekend day, where use of the range is most intense and when homeowners are more likely to be at home and outside. Excerpts of Old's recordings were admitted into evidence and played for the Court during the hearing, along with two video and sound recordings in 2022 and 2023 by Ms. Beldock. Old noted that the Laberge Shooting Range is roughly .75 miles away from the Beldock property and that topography can have a major influence on the effect of sound, such that masses like mountains or clusters of trees can muffle or lessen the impact.

In 2021, Old recorded approximately 2700 gunshots on the day analyzed, and in 2024, he recorded approximately 3600, demonstrating an increase in activity. *See* Exs. 10, 11. This is more than Old has previously recorded in Vermont. The gunshots were clearly audible on the property, and at times almost constant during the recordings. They were primarily concentrated between 10:00 a.m. and 4:00 p.m. According to Old, impulsive and startling noises like gunshots are more intrusive to the human ear. In his reports, Old documented different sound level metrics, using weighting for different frequencies to correspond to how the human ear hears sounds, to arrive at a level to then compare to various industry thresholds. Old focused on the dBA weighting for sound level and sound exposure (energy of the sound event) and found maximum levels of 63 dBA Leq, 69 dBA Lfmax, and 68 dBA SEL. *See* Ex. 10 at 4, 6. Because there is no exact threshold for the acceptable level of gunshot noise near residences in a rural setting, Old looked to another applicable industry standard (used in military settings) and made certain adjustments for outdoor noise and the rural setting. He found that the sound measurements at the Beldock property exceeded that threshold (60 dBA Lfmax, after adjustments) by a metric that is almost double the loudness. He also concluded that the sound measurements at the Beldock property exceeded the ACT 250 threshold at which an adverse noise impact would be expected by 8 dBA, which would be perceived by the human ear somewhere between clearly noticeable and double the loudness. Finally, Old cited a research study which found that listeners reported a high rate of annoyance from sounds at the level of 65 dBA SEL, which is lower than the 68 dBA SEL level recorded at the Beldock property. The data collected and analyzed by Old in 2024 showed similar sound levels as those recorded in 2021, with higher activity levels, leading him to credibly conclude that the 2021 report and measurements were still appropriate.

The Town disputes Old's findings that the sound measurements on the Beldock property exceed the cited thresholds, arguing that they are irrelevant and the adjustments made are not appropriate. However, the Court credits Old's testimony that the outdoor/indoor and rural character adjustments are appropriate industry "rules of thumb," and also that the property location in Charlotte is reasonably described as rural in nature and "has a greater expectation for and value placed on 'peace and quiet.'" Ex. 12 at 6. The Town presented the testimony of its noise control engineer and expert, Michael Bahtiarian, of Acentech Consulting. He performed a "peer review" analysis of Old's reports, but did not visit the property or collect any additional data. Mr. Bahtiarian indicated he would have graphed all four days of sound data collected, but otherwise he did not disagree with Old's methodology. He has used the 15dBA adjustment for indoor to outdoor noise, and does not challenge its use by Old. However, he questioned the adjustment for the rural character of the property because he is not aware of the setting used for the original threshold and how it may differ from the Beldocks' property. *See* Ex. O. Further,

4

Bahtiarian acknowledged that the existence of windows is a major factor in adjusting between indoor and outdoor noise, and more glass would make the adjustment lower (meaning that more sound would penetrate inside).

During the hearing, the Beldocks presented several residential real estate agents with extensive experience working in Chittenden County, who credibly testified that the gunshot noise from the Laberge Shooting Range would make it difficult to sell the Beldocks' property. The existence of the gunshot noise would need to be disclosed to prospective purchasers or the seller would risk a lawsuit. Although not every disclosure carries a negative effect, buyers looking to purchase property in the range of $1.5-2 million are very discerning and would be impacted by external factors. Typically, they have many options for properties in which to invest their money; the gunshot noise affects marketability, as it is out of character with their lifestyle and expected use and enjoyment of the property. Realtors showing properties near the shooting range have had potential buyers who were disturbed by the gunshots and walked away once they heard the noise. In their experience, the noise is concerning and offensive to buyers, and at times has felt like being in a "war zone." These agents have had clients who reduced the sale price of properties based on the gunshot noise. Several of the witnesses brought their concerns to the attention of the Town of Charlotte BCA by email or letter in 2023 to argue in support of a Town noise ordinance. These witnesses also acknowledged that there can be many factors that impact the selling price of a property, including that during the Covid-19 pandemic (which covered the 2022 and 2023 tax assessment period), there were many motivated buyers, which created a "sellers' market," such that properties sold quickly, and some were even purchased sight-unseen. There have been properties within a one-mile radius of the shooting range that sold above their assessed value. In addition, a member of the BCA and the property inspection committee for the Beldocks' property in 2023 reported that the gunshot noise was noticeably loud during the September 2023 inspection of the property. She acknowledged that she would probably find it difficult to live on the property, and confirmed the committee's recommendation that the noise from the shooting range "could have some negative effect on the sales value of the property." Ex. 21.

As owners of the property, the Beldocks testified as to their opinion of fair market value. Mr. Beldock also has experience buying and selling real estate since the late 1980s, and he was disclosed as an expert on property valuation in this case. Beldock expressed several views of the actual fair market value of his property. First, he opined that the fair market value of the property is around $600,000. He explained that this conclusion is based on his determination that the outdoor areas of the property are rendered essentially unusable by the pervasive gunshot noise from the Laberge Shooting Range and the attendant disruption of daily life, safety concerns, and impact on physical and mental health, combined with the significant costs incurring in maintaining these areas. He also cited the reduced marketability of the property and his concerns about being unable to purchase "tail insurance" to cover any lawsuits brought by a new owner following a sale. Therefore, Beldock believes the value is more comparable to a three-bedroom condominium in Chittenden County. After conducting some internet market research, he concluded that this value is $600,000.

Additionally, Beldock analyzed the list of sales within a one-mile radius of the Laberge Shooting Range that was generated by Ms. Truchon for the Town in this action. *See* Ex. 25.

5

Truchon testified that she conducted a search back to 2004 to find a list of 18 properties located within a one mile of the shooting range that had sold during that time period. Some of the properties sold more than once. Beldock worked from Truchon's list and created a separate spreadsheet comparing the sale prices of the properties to their current 2023 appraisal values. Ex. 24. Beldock noted that, on average, the sale prices for these properties were 67% of the current assessments. Accordingly, Beldock opined that, although he believes the conditions on his property are worse than at the properties listed, a reasonable determination of the fair market value of the property would be 67% of the assessed values for 2022 and 2023 ($972,639 and $1,386,766, respectively). Ms. Beldock agreed with this opinion. Using data from real estate websites like "Zillow," Mr. Beldock also researched the properties listed on Exhibits 24 and 25 to determine how long they were on the market prior to being sold and what changes or reductions were made to the selling prices. Exs. 5, 26. From this analysis, Beldock concluded that the properties sold at an average of 87% of the asking price, and this supported his opinions of the fair market value of the property. Beldock did not independently verify the information contained in the Zillow listings and reports.

Ms. Truchon testified as an expert witness on fair market value for the Town. She explained that, for purposes of the appeal, and in order to confirm the accuracy of the 2022 and 2023 assessments, she ran a "comparables report" using the MicroSolve CAMA Systems data. *See* Exs. F, M. This program finds properties that have sold with similar characteristics as a subject property, and then makes positive and negative adjustments to estimate the subject property's fair market value. The comparable properties are not necessarily in Charlotte, or even in Vermont. Moreover, the CAMA System made no adjustments based on the Beldock property's proximity to the Laberge Shooting Range or the impact of gunshot noise on the property. Based on the weighted means for the adjusted values of the comparable properties and values in the 2022 and 2023 reports, Truchon concluded that the assessed fair market value of the Beldock's property for those years was reasonable.

In addition, Truchon created a second spreadsheet analyzing the 18 properties within a mile of the Laberge Shooting Range that sold between 2004 and 2022 to compare the sale prices to their appraisal or grand list values at the time of the sale, based on information from the property transfer tax returns filed. Ex. AA. This was in response to the Beldocks' Exhibit 24. The Town contends that this analysis is more probative of whether the assessed property values at the times of sale approximated fair market value. On average, the properties listed on Exhibit AA sold for 101.56% of their grand list value for the year of the sale. The parties spent considerable hearing time discussing the characteristics of the various properties on Ex. AA (including proximity to the shooting range, topography, and impact of the gunshot noise) and comparing and contrasting these factors to the Beldocks' property. They also discussed the circumstances of the property sales that may have impacted the selling price. Beldock maintains that the most comparable properties to his own on Exhibit AA are numbers 2 and 5-13, which are in the "bad corridor." Focusing on these properties, the average sale to assessment ratio is 83%. Ex. AA. According to Beldock, this demonstrates that the Town's appraisals improperly fail to consider the negative impact of gunshot noise from the Laberge Shooting Range on their fair market value.

The Town also called Edgar Clodfelter from Calais, Vermont as an expert to testify regarding the concept of economic obsolescence or depreciation in connection with fair market value determination. Mr. Clodfelter is a senior appraiser for NEMRC and has worked in the field for 42 years. Clodfelter explained that there are three categories of depreciation that may be considered in determining fair market value: physical depreciation, functional depreciation, and economic depreciation (or obsolescence). This last category refers to something external to the property which cannot be controlled or remedied by the property owner (such as proximity to a lumber mill or shooting range). To measure economic obsolescence, one must compare the difference in the value of a property with the external influence and without it. This can be difficult to do and requires a considerable amount of data. In Clodfelter's view, the method of conducting an appraisal based on comparables or matched pairs sales might not work for the Beldock property, given the lack of appropriate comparables to the Beldocks' property. The sales ratio method would review similar sales in the area and compare the ratio of sale price to assessed value for the affected area to the typical town ratio from a "control group" where no gunshot noise is experienced. Clodfelter testified that this method would look at the assessed value during the tax year of the sale. However, in order to be reliable and accurate, a large number of sales per year is required. According to Clodfelter, 500 sales per year is a good metric, but "10 sales per year is less good." This is because fewer sales means the data is less reliable. Clodfelter acknowledged that if the level of use of the gun range had changed, it would be reasonable to take this into account.

<u>Discussion</u>

In a property tax appeal under 33 V.S.A. § 4467, "when a town produces evidence of fair market value, there is a basic presumption that a town's appraisal is valid and legal." *Jackson Gore Inn v. Town of Ludlow*, 2020 VT 11, ¶ 35, 211 Vt. 498 (quotation omitted). "This is a bursting bubble presumption; if the taxpayer presents any evidence that his property was appraised above fair market value, then the presumption disappears, and it is up to the town to introduce evidence that justifies its appraisal." *Vanderminden v. Town of Wells*, 2013 VT 49, ¶ 8, 194 Vt. 96, 101 (quotation omitted). "Once the presumption disappears, the town is required to show either that it substantially complied with the relevant statutory and constitutional requirements or that its valuation was supported by independent evidence of fair market value." *Jackson Gore Inn*, 2020 VT 11, ¶ 37 (quoting *Vanderminden*, 2013 VT 49, ¶ 8). "The ultimate burden of persuading the court that the town's appraisal is incorrect remains with the taxpayer." *Vanderminden*, 2013 VT 49, ¶ 8 (quotation omitted).

Here, the Court easily concludes that the Beldocks have met their burden to overcome the presumption of validity as to the Town's appraisal. There is no dispute that the impact of the gunshot noise from the Laberge Shooting Range was not considered by the Town as an element of fair market value. However, multiple witnesses presented credible and essentially unrefuted testimony regarding the negative effect of the property's proximity to the shooting range as a general matter and on its marketability. In addition to their own accounts, the Beldocks' sound engineer presented evidence that in 2021 he recorded 2700 daily gunshots on the property and that by 2024 this number increased to 3600. Gunshot noises are startling and intrusive to the human ear, and out of character with the peaceful and pastoral setting of the property. The level

7

of noise at the Beldocks' property has been shown to cause a high rate of annoyance to people.[2] The atmosphere resembles a war zone when the shooting range is operating and the exposure to the gunshot noise is exhausting and wears on the physical and mental health of persons living on the property.

Further, the gunshot noise would have to be disclosed to any potential buyers and would affect such buyers' decision-making, particularly those seeking to invest their money in properties worth over $1 million. Real estate agents who showed properties near the shooting range where noise could be heard stated that potential buyers were offended and disturbed by the gunshots and walked away without further consideration. Indeed, the 2023 BCA Property Inspection Committee reported that the noise from the shooting range "could have some negative effect on the sales value of the property," and a BCA member who experienced the gunshot noise at the Beldocks' property admitted she would find it difficult to live there. Moreover, as the Town and one of its experts acknowledged, Vermont recognizes the principle of economic depreciation or obsolescence as an appropriate factor that may be considered in determining fair market value. *See, e.g.*, *Breault v. Town of Jericho*, 155 Vt. 565, 567, 586 A.2d 1153, 1154 (1991) (affirming reduction in fair market value for "economic obsolescence" based on property's proximity to town landfill and salt shed). Therefore, the Court finds the Beldocks have produced admissible "evidence fairly and reasonably tending to show that their property was appraised at more than fair market value." *Jackson Gore Inn*, 2020 VT 11, ¶ 35 (quotation omitted). As the *Jackson Gore Inn* Court noted, because "the applicable standard concerns the admissibility, rather than credibility, of the facts used to overcome the presumption, "the evidence required to burst the bubble is modest." *Id*. (quotation omitted). Accordingly, the Court proceeds to consider the proper determination of the fair market value of the Beldocks' property.

The Court must make a de novo determination of the fair market value of the Beldocks' property as of April 1, 2022 and 2023. 32 V.S.A. § 4467; *see also Dewey v. Town of Waitsfield*, 2008 VT 41, ¶ 2, 184 Vt. 92 (citing statute). The fair market value of a property is defined as "the price that the property will bring in the market when offered for sale and purchased by another, taking into consideration all the elements of the availability of the property, its use both potential and prospective, any functional deficiencies, and all other elements such as age and condition that combine to give property a market value." 32 V.S.A. § 3481(1)(A); *see also Barrett v. Town of Warren*, 2005 VT 107, ¶ 6, 179 Vt. 134 (quoting § 3481).[3] The goal of property tax appraisal is to list all properties at fair market value so that "no property owner pays more than his or her fair share of the tax burden." *Barnett v. Town of Wolcott*, 2009 VT 32, ¶ 4,

---

[2] While the Court found Mr. Old's opinions credible and persuasive, even leaving aside the adjustments made and comparison to industry standards, Old's evidence and analysis established by a preponderance of the evidence that the level of intrusion and impact of the noise from the shooting range at the property is significant and substantial.

[3] Determining the correct valuation in a property tax appeal has been described as a "two-step process": after ascertaining fair market value, that "value is 'equalized' to insure that the property is listed comparably to corresponding properties in town." *Dewey*, 2008 VT 41, ¶ 2, (quotation omitted). Here, the parties have stipulated to equalization; therefore, the Court does not reach the issue.

185 Vt. 627 (mem.).  Vermont law "does not prescribe the method nor limit the manner in which evidence of fair market value may be presented."  *Sondergeld v. Town of Hubbardton*, 150 Vt. 565, 567, 556 A.2d 64, 66 (1988).  As long as the trial court's determination "appears to be fair, just and equitable according to the evidence presented," it will be upheld.  *TransCanada Hydro N.E., Inc. v. Town of Rockingham*, 2016 VT 100, ¶ 38, 203 Vt. 289 (quotation omitted); *see also State Hous. Auth. v. Town of Northfield*, 2007 VT 63, ¶ 5, 182 Vt. 90 (stating that "any valuation method resulting in a rational determination of fair market value will survive scrutiny" (citation omitted)).

The more difficult question in this case is how to determine the fair market value of the Beldocks' property.  The Court does not find the approaches proposed by the Beldocks or the Town to be persuasive.  While Mr. Beldock is entitled to offer his opinion as a property owner, *see* 12 V.S.A. § 1604, the assertion that the 178-acre property has the same value as a three-bedroom condominium in Burlington, which he contends would be $600,000, was not supported by independent evidence or analysis, and is not compelling.  Further, the Court agrees with the Town that the Beldocks' exercise of comparing the sale prices of 18 properties within a one-mile radius of the Laberge Shooting Range that occurred within the 18-year time period from 2004 to 2022 to their assessed values in 2023 bears no correlation to whether those properties would sell for less than their assessed values in 2022 and 2023, particularly given the assertion that activity at the range only began to materially increase in 2019 or 2020.  *See* Ex. 24.  Thus, the resulting assertion that the Beldocks' property should be valued at 67% of the current assessment is not particularly sound or reliable.  Nor can the Court draw any specific conclusions from Mr. Beldock's analysis of internet data concerning how long these properties were listed on the market prior to being sold and any reductions in their selling prices, given the multitude of factors that could affect such circumstances.

On the other hand, the Court finds the Town's assertion that CAMA System comparable sales reports support the assessed values is also flawed.  The Town failed to demonstrate that the properties selected by the automated program were appropriately comparable to the Beldocks' property.  Moreover, the CAMA System made no adjustments based on the Beldock property's proximity to the Laberge Shooting Range or the impact of gunshot noise on the property.  Therefore, the Court cannot conclude that the selected properties are suitable, or that all the necessary adjustments were made, to produce a reliable metric of fair market value.  *See Lake Morey Inn Golf Resort, LP v. Town of Fairlee*, 167 Vt. 245, 249, 704 A.2d 785, 788 (1997) (the Court has "consistently held" that the "decision to use or reject comparable properties is not a question of law but instead is an evidentiary question" (quotation omitted)); *Scott Const., Inc. v. City of Newport Bd. of Civ. Auth.*, 165 Vt. 232, 239, 683 A.2d 382, 386 (1996) ("Comparable properties are rarely, if ever, identical properties.  Absent abuse of discretion, the degree of comparability goes to the weight of the evidence and is a matter for the trier of fact."); *cf. Dewey*, 2008 VT 41, ¶ 16 (dismissing taxpayer's challenge to fair market value determination where trial court relied on expert's "careful selection of comparable high-end properties and the precision with which he made his adjustments").

Likewise, the Court affords little weight to Ex. AA, which analyzed the same 18 properties to compare the sale prices to their grand list at the time of the sale.  The spreadsheet identifies no control group and does not contain enough data to make reliable predictions or

generalizations. As Mr. Clodfelter explained, such an analysis would need to be based on hundreds of sales in a year to be accurate; thus, one or two sales a year is insufficient. In addition, the evidence established that the gunshot noise from the shooting range did not become a discernable problem until 2019 or 2020. Therefore, sales prior to that period would not accurately reflect the negative impact and must be discounted. Further, none of properties on the spreadsheet were assessed at over $1 million, which the evidence showed brings a particularly discerning type of purchaser. In short, the Court agrees with Town's expert that, given the unique aspects of the property, there are insufficient comparables available to adopt that valuation method, and similarly, the sales ratio method is unreliable given the mere handful of relevant sales.

"When there are too few comparable transactions to provide a reference for determining fair market value, [the Supreme Court has] upheld the use of any or all methods or combination of methods that result in a rational determination." *In re Bilmar Team Cleaners*, 2015 VT 10, ¶ 13, 198 Vt. 330 (quotation omitted). Ultimately, the Court concludes that the "cost approach method" originally used by the Town appraiser is the best method of calculating the fair market value of the Beldocks' property. *See Lake Morey Inn Golf Resort*, 167 Vt. at 249, 704 A.2d at 787 (upholding use of "costs" method of valuation over "market comparable" method). In addition, the Court finds that an appropriate adjustment should be made for economic depreciation or obsolescence in light of the proximity to the Laberge Shooting Range. As discussed above, "economic obsolescence . . . refers to loss from the upper limit of value due to factors external to the property." *Breault*, 155 Vt. at 567, 586 A.2d at 1153 (quotation omitted) (noting that the Vermont State Appraisal Manual defines the concept as "any outside influence that would adversely affect the value of the subject property, such as an adjacent gas station, shop or any undesirable type of use" (quotation omitted)). Such factors are beyond the control of the property owner. As a leading treatise explains, "locational obsolescence," which is one form of external obsolescence, "is caused by proximity to some detrimental influence on value such as heavy traffic, a landfill, or other undesirable land use outside the property being appraised." Ex. Q (The Appraisal Institute, *The Appraisal of Real Estate* 593 (15th ed. 2020)); *see also Lesage v. Town of Colchester*, 2013 VT 48, ¶ 20, 194 Vt. 377 ("[I]t is hard to imagine any factor more closely tied to the value of a building than its location."). Cases from Vermont and elsewhere provide various examples of appraising authorities applying this type of deduction in fair market value determinatons. *See, e.g., Schmitt v. Bd. of Assessment Appeals of Madison*, No. 478247, 2005 WL 1274181, at *3 (Conn. Super. Ct. May 4, 2005) (unpub. mem.) (concluding that subject property value was negatively affected by "seasonal noise from the local athletic fields and other nearby facilities"); *Warren Twp. v. Suffness*, 414, 542 A.2d 931, 939 (N.J. App. Div. 1988) (affirming court's "deduction from the value" of property "to account for the adverse effect of the lot's proximity" to quarry operation, including noise and dust produced); *Royle v. Town of Pomfret*, Docket No. 2003-358, 2004 WL 5582554, at *2 (Vt. Apr. 2004) (unpub. mem.) (noting town's application of economic depreciation reduction "due to a nearby riding stable");[4]

---

[4] Trial courts are free to "consider three-justice decisions from [the Vermont Supreme] Court for their persuasive value, even though such decisions are not controlling precedent." *Washburn v. Fowlkes*, Docket No. 2015-089, 2015 WL 4771613, at *3 (Vt. Aug. 2015) (unpub. mem.) (citing V.R.A.P. 33.1(d), which provides that an "unpublished decision by a three-justice panel

*Nicholas v. Town of Pownal*, Docket No. 2001-340, 2002 WL 34423792, at *2 (Vt. Jan. 2002) (unpub. mem.) (value of subject property reduced by economic obsolescence adjustment based on impact of adjacent toxic landfill); *Breault*, 155 Vt. at 567, 586 A.2d at 1153 (approving Board's application of "locational obsolescence factor" based on determination that proximity "to both the Town landfill and the Town salt shed constitutes an impairment in the desirability" of the property, and citing cases).

Based on all of the evidence in the record regarding the impact of the gunshot noise from the Laberge Shooting Range on the Beldocks' property, the Court concludes that a 25% reduction in value for external obsolescence is reasonable and appropriate. The Court rejects the assertion that the land itself is entirely devoid of value due to the shooting range – the Beldocks still live on the property, the gunshots do not occur continuously throughout the entire day, and the land still sits in a scenic setting with residential, recreational and agrarian uses. But likewise, it is incorrect to suggest that the gunshot noise has zero adverse impact on the desirability, use, and enjoyment of the property for its intended purposes or on "the price that the property will bring in the market," particularly in the high-end sector. In reaching its conclusion, the Court has considered the nature and intrusiveness of the gunshots, the negative effect on the use of the outdoor recreation areas, as well as the home and surrounding buildings and spaces, the overall disturbing experience of living on the property, the offensiveness of the noise to the otherwise peaceful and bucolic atmosphere of the area, and the unrefuted evidence that the existence of the noise must be disclosed to potential purchasers and affects its marketability. Moreover, the evidence established that on the days the range is most heavily used, the gunshot noise is most prevalent and concentrated during the six-hour period between 10:00 a.m. and 4:00 p.m., which represents one-quarter of the day.[5] Because the gunshot noise impacts both the value of the land and structures on the property, it is appropriate to apply the percentage reduction in multiple areas (economic depreciation category, the grade multiplier applied to the land values, and value of the outbuildings). *See* Ex. Q, *The Appraisal of Real Estate* 594 (discussing appropriate method of allocating external obsolescence "loss in value that is shared proportionately by both the land and building components of the property"). Indeed, the Town's 2022 and 2023 Property Record Cards for the Beldocks' property contain a line item for "economic depreciation" although no adjustment was made by the Town. Further, according to Ms. Truchon, any adjustments to the land values based on positive or negative influences were made in the "Grade" assignment, rather than in the "Neighborhood" multiplier. *See* Exs. A, B.

Applying the percentage reduction to the cost analysis performed by the Town to determine its assessment value in 2023 and 2022, the Court finds that the fair market value of the Beldocks' property in 2023 is $1,521,065 and in 2022 is $1,069,162. To arrive at these fair market values, the Court included a deduction of 25% of the replacement cost of the home for economic depreciation and also reduced the value of the outbuildings by 25%. In addition, the

---

may be cited as persuasive authority but is not controlling precedent," except under limited circumstances).

[5] It may be argued that this period represents an even greater portion of the day, if one focuses on the typical waking hours of 6:00 a.m. to 10:00 p.m. and the optimal times for activity and productivity.

Court reduced the "Grade" multipliers applied to the land values by 25%.[6]  The calculations are set forth below.  The adjustments made by the Court to the Town's numbers are indicated in italics.

**2023 (Ex. B)**

| CATEGORY | MULTIPLIER | VALUE |
|---|---|---|
| Replacement Cost New | | $1,155,548 |
| Physical depreciation | 13% | (- $150,221) |
| Economic depreciation | 25% | *(- $288,887)* |
| **Replacement Cost New Less Depreciation** | | **$716,440** |
| | | |
| Land Prices – SI Bldg Lot | Grade 1.5 | *$375,000* |
| AC Other | Grade .75 | *$302,850* |
| **Land Prices Total** | | **$677,850** |
| | | |
| **Site Improvements Total** | | **$25,000** |
| **Outbuildings Value Total** | .75 | *$101,775* |
| | | |
| **TOTAL PROPERTY VALUE** | | **$1,521,065** |

**2022 (Ex. A)**

| CATEGORY | MULTIPLIER | VALUE |
|---|---|---|
| Replacement Cost New | | $821,496 |
| Physical depreciation | 12% | (- $98,580) |
| Economic depreciation | 25% | *(- $205,374)* |
| **Replacement Cost New Less Depreciation** | | **$517,542** |
| | | |
| Land Prices – SI Bldg Lot | Grade 1.125 | *$168,750* |
| AC Other | Grade .75 | *$176,495* |
| AC Other | Grade .6 | *$98,100* |
| **Land Prices Total** | | **$443,345** |
| | | |
| **Site Improvements Total** | | **$20,000** |
| **Outbuildings Value Total** | .75 | *$88,275* |
| | | |
| **TOTAL PROPERTY VALUE** | | **$1,069,162** |

---

[6] No evidence was presented that the values of the water and sewer site improvements were impacted by the gunshot noise; therefore, the Court did not apply any reduction to this category.

The Court notes that these determinations of fair market value are within the range of the evidence presented by the parties.[7] *See Lake Morey Inn Golf Resort*, 167 Vt. at 248, 251, 704 A.2d at 787, 789 (affirming Board's value determination that was "within the evidence and, more importantly, within the range of rationality," although Board "discounted the parties' analyses," due to errors in the methodology and instead "conducted its own cost-approach analysis" (quotation omitted)). As our Supreme Court has held, "[w]here there is a factor that requires an adjustment to value of property, but there is little evidence to indicate how that factor affects the valuation, it is within [the factfinder's] expertise and discretion to make a reasonable adjustment for that factor as long as it lies within the range of the evidence." *Dernier v. Town of Weston*, Docket No. 2013-082, 2013 WL 9057076, at *3 (Vt. Oct. 2013) (unpub. mem.). The Court has considered all the evidence and arguments of the parties, and made its determination of fair market value accordingly.

### Order

For the foregoing reasons, the Court finds the fair market value of the property owned by Appellants Gregg and Elizabeth Beldock located at 900 Plouffe Lane in Charlotte, Vermont as of April 1, 2022 is $1,069,162, and the fair market value of the Beldocks' property as of April 1, 2023 is $1,521,065.

The listed value shall remain in effect for no less than three years in the absence of changes to the property or a town-wide reappraisal.

If either party believes a further or separate Judgment Order is required, they shall submit a proposed order within seven days. *See* V.R.C.P. 58(d).

Electronically signed on February 6, 2026 at 1:43 PM pursuant to V.R.E.F. 9(d).

Megan J. Shafritz
Superior Court Judge

---

[7] The Beldocks argue that the property should be valued at $600,000 or $972,639 in 2022 and $600,000 or $1,386,766 in 2023. The Town asserts the actual assessed values of $1,451,700 in 2022 and $2,069,800 in 2023 are correct.